Edward J. BRUNENKANT, Plaintiff-Appellant,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant-Appellee.

No. 13715.

United States Court of Appeals Seventh Circuit.

Oct. 31, 1962.

Rehearing Denied Jan. 2, 1963.

**356**

Edward J. Brunenkant, Sun City, Ariz., for appellant.

Morton Hollander, Chief, Appellate Section, Stephen B. Swartz, Atty., Dept. of Justice, Washington, D. C., James P. O'Brien, U. S. Atty., Chicago, Ill., Joseph D. Guilfoyle, Acting Asst. Atty. Gen., for appellee.

Before KNOCH, CASTLE and SWY-GERT, Circuit Judges.

CASTLE, Circuit Judge.

Edward J. Brunenkant, plaintiff-appellant, brought this action in the District Court, pursuant to 42 U.S.C.A. § 405 (g), to review a final decision[1] of the Secretary of Health, Education and Welfare denying the claims of plaintiff and his wife for old-age insurance benefits under the Social Security Act.[2] The District Court granted summary judgment for the defendant-appellee and the plaintiff appealed.

Plaintiff and his wife applied for old-age insurance benefits on January 15, 1958. Denial of the applications led to the subsequent administrative proceeding and judicial review action which culminated in this appeal. Plaintiff had reached retirement age on December 21, 1957. Under the then applicable provisions of the Act, in order to qualify as fully insured for old-age insurance benefits, he was required to have either 13 quarters of coverage among the 27 quarters elapsing between January 1, 1951 and September 30, 1957 or at least 7 of the 11 quarters elapsing between January 1, 1955 and September 30, 1957. It is conceded that the limitation period of the Act (42 U.S.C.A. § 405(c)) makes uncontestable plaintiff's claim to 4 quarters of coverage during 1953 based upon income he reported for that period as creditable self-employment income. Plaintiff claims that the record establishes that he received income creditable as self-employment income or as wages during the years 1955, 1956 and 1957 which for old-age insurance coverage purposes supplies the necessary additional quarters, or in itself constitutes the requisite quarters of coverage, for his qualification as fully insured.

▆ We recently had occasion to point out (Sherrick v. Ribicoff, 7 Cir., 300 F.2d 494, 495) that under the provisions of § 205(g) of the Act (42 U.S. C.A. § 405(g)) the factual findings of the Secretary, if supported by substantial evidence, are conclusive and that this finality attaches not only to the findings themselves but also to the inferences and conclusions drawn from the facts if a substantial basis for them appears in the record.

Thus the contested issue presented for our determination by plaintiff's appeal is whether the Secretary's findings and conclusions that the plaintiff did not in the years 1955, 1956 and 1957 receive income creditable for old-age insurance coverage purposes are supported by sub-

---

1. The final decision is a decision by the Appeals Council of the Social Security Administration affirming a decision made by a referee (hearing examiner) of the Administration.

2. Title II of the Social Security Act (42 U.S.C.A. §§ 401–425) referred to herein as "Act".

stantial evidence and based upon the application of correct legal criteria.

Plaintiff contends that his 1955–1957 income or earnings from futures trading on his own account as an "odd-lot specialist" in wheat futures on the Chicago Board of Trade are creditable as self-employment income. He further contends that he received other 1955–1957 earnings from a corporation of which he was president which are creditable as wages or, in the alternative, that the 1956–1957 portion of such earnings is self-employment income received for legal services rendered the corporation.

The basic facts are not in dispute. The record establishes that the plaintiff is a licensed attorney. For a number of years, including the 1955–1957 period, he was a member of the Chicago Board of Trade, a commodity exchange, and engaged in the buying and selling of wheat futures as an odd-lot specialist. In addition he traded as a speculator in futures of other commodities. An odd-lot specialist is one who, in contrast to the usual futures trading in "round" lots of 5,000 bushels restricts himself to the buying and selling of smaller quantities of a particular commodity. A distinctive feature of an odd-lot specialist's transactions in futures is the ⅛ of a cent margin involved. Odd-lot futures are bought for ⅛ cent per bushel below, and sold for ⅛ cent per bushel above, the current market price.

Plaintiff's contention that his profits from his odd-lot specialist trading constitute creditable self-employment income was rejected by the final administrative decision of the Secretary affirmed by the District Court. We perceive no error in that ruling. Profits from futures trading are considered for income tax purposes as gains from the sale or exchange of capital assets. Faroll v. Jarecki, 7 Cir., 231 F.2d 281, cert. den., 352 U.S. 830, 77 S.Ct. 45, 1 L.Ed.2d 51. Therefore, such profits are clearly within the express exclusion of § 211(a) (3) (A) of the Act (42 U.S.C.A. § 411(a) (3) (A)), and are to be disregarded for the purposes of computing self-employment income under the Act. In Faroll we distinguished Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29, as a case where such profits were held to constitute ordinary income and not capital gains because of the hedging aspect there involved *and* the fact that the future transactions were an integral part of the taxpayer's manufacturing business. In that case a manufacturer of corn products purchased corn futures in order to protect its manufacturing operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements without providing storage facilities. It took delivery of some of the corn according to its needs and sold the remainder at a profit. The futures transactions there involved afforded partial insurance against the principal risk of its manufacturing enterprise—a price rise in the raw material. The taxpayer's sales policy, selling its products for future delivery at a set price or at market price on the date of delivery, whichever was the lower, left it exceedingly vulnerable to rises in the price of corn.

Plaintiff's reliance upon Corn Products is misplaced. Plaintiff was not a manufacturer, processor or handler of the actual commodity but merely a trader in futures of the commodity who did not contemplate taking possession of the "actuals". Moreover, although plaintiff attempted to maintain a balance in his futures commitments, as nearly as market conditions would permit, the record does not disclose that his purchases and sales were ever perfectly matched. And to the extent that his futures commitments remained unmatched he took the full risks of price swings. In addition the illustrative daily trade records submitted by the plaintiff reflect the realities of the market. There was no matching of each purchase or sale at identical prices and his profit (or loss) consisted of both the ⅛ cent per bushel margin exacted for odd-lot transactions, a built-in capital gain in such transactions, and the

price differential between the matched transactions. The fact that plaintiff chose contemporaneously to match most of his transactions (thereby taking only the risk of the daily short swings in the market) and run the risk of long-run price fluctuations on a small part of his trading merely reveals plaintiff's conservative trading position. The limited degree of his speculation does not, for the purposes here concerned, either change the nature of his trading activities or qualify his profits therefrom as self-employment income rather than capital gains.

The evidence concerning receipt of wages by the plaintiff during the 1955–1957 period, except for certain entries in the records and tax returns of Commodity Investment Corporation, consists of plaintiff's testimony that in 1955 he was paid $3,576.00 in cash as salary by the corporation, and in 1956 and 1957 he was given notes of the corporation for $3,576.00 and $3,673.48, repectively, in payment of salary, which notes were exchanged for stock issued by the corporation in 1960 for their payment.

Commodity Investment Corporation was formed by the plaintiff, his wife, and his daughter, who comprised its board of directors. It was capitalized at $1,000 represented by 1,000 shares of common stock authorized and issued. Plaintiff, the corporation's president and treasurer, owned the controlling interest. The remaining stock was owned by plaintiff's wife, the corporation's secretary, and by his daughter, and his son. Neither the wife nor the daughter received any compensation for services as officer or director of the corporation. The corporation's address was that of plaintiff's residence; it had no telephone listing, nor did its name appear on any corporate registry other than that published by the state of its incorporation. The corporation's bank account carried a nominal balance of from $200.00 to $400.00.

The corporation had no income prior to 1955 at which time it commenced trading operations. Although its charter permitted of a broader range of activities the corporation's actual activity was limited to commodity trading on the Chicago Board of Trade where it availed itself of plaintiff's membership. Its primary "asset" was the privilege afforded by plaintiff's Board of Trade membership and its income was solely the product of the use made of that membership in trading activities.

In 1955, the corporation's gross receipts were $4,500. Its balance sheet for that year discloses a net profit of $6.00 after deduction of $294.00 in expenses other than $4,200.00 listed as "salaries." In 1956 and 1957 the corporation sustained net operating losses of $3,974.84 and $2,671.05 according to its balance sheets and the plaintiff testified he was given notes for his salary. In 1958 the corporation decided to pay salaries only if it made money and provided that each officer was to receive a stated percentage of annual net earnings. In that year on gross receipts of $728.00 a net operating loss of $21.97 was sustained.

■ The administrative finding and conclusion that plaintiff's family corporation was utilized as a mere device to secure social security coverage through a personal activity of the plaintiff which was otherwise barred from such coverage finds substantial support in the record. The evidence considered as a whole, including the inferences which have a reasonable and substantial basis therein, support the conclusion that during the years 1955–1957 the sole function of the corporation was its utilization by the plaintiff as a device to create a sham employment relationship for the sole purpose of attempting to convert his noncreditable earnings from futures trading into creditable wages. The corporation was a family corporation under plaintiff's sole and complete control. Its sole income producing activity involved the use of his exchange membership. The regularity and validity of its organization does not serve to overcome the fact that its "corporate shell" was diverted to the purpose of serving as a channel through which plaintiff's membership on the exchange might serve to produce "wages"

creditable to him for social security purposes. Cf. Higgins v. Smith, 308 U.S. 473, 476–478, 60 S.Ct. 355, 84 L.Ed. 406; Howatt v. Folsom, E. D. Pa., 160 F.Supp. 490, affirmed 253 F.2d 680 (C.A.3). Although the corporation was organized in 1953 it was not until 1955 that it commenced trading activities. Early in 1955 plaintiff had learned that his gains from futures trading on his own account, because of the reversal of an earlier Bureau of Internal Revenue ruling, would no longer be regarded as creditable self-employment income. And, it was not until that same year that he was voted a salary as president and treasurer of the corporation.

Moreover, although the corporation remitted the social security taxes due on the salary plaintiff testified he was paid, he presented no evidence to corroborate the receipt of the $3,576.00 cash salary payment for 1955. His testimony as to the nominal bank balance of the corporation appears inconsistent with such a payment. The 1956 salary note was not produced. The evidence of the 1957 payments are the notes which in turn were redeemed in 1960 by the issuance of stock which, in the light of the evidence concerning the corporation's financial structure and net operating losses, would appear to be worthless.

Nor are we persuaded by plaintiff's alternative contention that the 1956–1957 portion of his earnings from the corporation was self-employment income attributable to services rendered the corporation as a lawyer. The contention is wholly inconsistent with the documentary evidence presented and relied upon by the plaintiff—material of the plaintiff's own making—to establish his receipt of "wages" from the corporation and it is in direct conflict with the declarations made in his application for benefits that his self-employment earnings as a lawyer for each of those years was less than $400.00. Plaintiff points to a 1953 entry in the corporate minutes that plaintiff was to be paid for legal services performed "in his individual capacity as a practicing lawyer" in connection with the qualifying and underwriting of an issue of $1,000,000.00 of cumulative preferred stock authorized by the charter. But the compensation so authorized appears to bear no relationship to the $4,200.00 salary the directors resolved in each of the years 1955, 1956 and 1957 to pay the plaintiff "as President and Treasurer" of the corporation. The payments plaintiff claims to have received were in the latter amount (less tax deductions). The amount was also the maximum annual wages creditable for social security purposes.

The judgment order of the District Court is affirmed.

Affirmed.