**Raymond VOGEL, Plaintiff,**

v.

**Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.**

**No. 89 C 740.**

United States District Court, N.D. Illinois E.D.

Feb. 22, 1990.

Sheldon R. Waxman, South Haven, Mich., for plaintiff.

Anton R. Valukas, U.S. Atty., Frederick Branding, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

On December 1, 1988, defendant Louis Sullivan ("Secretary") denied the application of plaintiff Raymond Vogel ("Vogel") for old-age insurance benefits. Vogel now seeks review of this decision, arguing that the Secretary's conclusion that Vogel did not qualify for benefits on the basis of insufficient quarterly earnings is not supported by substantial evidence. Before this court are motions for summary judgment filed by both parties. For the following reasons, we grant the Secretary's motion and deny Vogel's.

## FACTS

Vogel was born on July 24, 1921. To qualify for full old-age insurance coverage under 42 U.S.C. § 402(a) (1982 & Supp. V 1987), both parties agree, Vogel needs 32 quarters of coverage—one for each year between 1950 and 1983, the year he reached age 62. 42 U.S.C. § 414(a).[1] When Vogel first attempted to secure social security retirement benefits in 1984, the Secretary credited him with only 25 quarters of coverage, earned prior to 1982,[2] and on that basis denied his claim (A.R. 62–67). Although Vogel claimed to be employed by the Post Construction Company for seven additional quarters between 1982 and 1984, the Secretary found that Vogel did not have a valid employment relationship with the company, and therefore payments received pursuant to this arrangement were deleted from Vogel's earnings.

Vogel did not appeal this ruling at the time, nor does he now contest it.

Since 1958, Vogel has owned an eight-unit apartment building at 1517 Bonnie Brae, River Forest, Illinois, and has rented out seven of those units, retaining the eighth for his own occupancy. In the wake of the Secretary's 1984 denial of his application for retirement benefits, Vogel formed the 1517 Bonnie Brae Building Corporation, allegedly on the advice of his accountant for tax purposes, and has served as its sole stockholder and officer since its inception. According to its Articles of Incorporation, the 1517 Bonnie Brae Building Corporation was formed "[t]o acquire, own, use, lease as lessor or lessee, convey and otherwise deal in and with real property and any interest therein" as well as "[t]o engage in any lawful act or activities for which corporations may be organized under the Illinois Close Corporation Act, relative to the foregoing" (A.R. 103). As an employee of this corporation, Vogel drew $300 a month but was responsible for the same duties that he performed without remuneration prior to incorporation; those duties consisted of collecting rents from the tenants, paying bills and keeping books, doing minor repairs, and arranging for the maintenance of the building (A.R. 26–28). The corporation additionally employed a handyman, who had worked for Vogel for approximately 30 years prior to incorporation, to mow the lawn, clean hallways, perform minor clean-up jobs, and do some repairs when Vogel was unavailable. On the basis of the additional quarters of coverage that Vogel's $300–a–month salary arguably translates into, he filed a new application for old-age insurance benefits on April 4, 1986.

1. An individual is credited with a quarter of coverage if he earns a certain specified amount in wages or self-employment income during a period of three months ending on March 31, June 30, September 30, or December 31. *See* 42 U.S.C. § 413(a) (1982 & Supp.1987).

2. The Secretary's records indicate that Vogel received one quarter of coverage in 1940 and four quarters of coverage on the basis of self-employment income for 1951 to 1955 and 1958; the records reflect no self-employment earnings for 1956 and 1957. The sum of these numbers is 25, which comports with the number of quarters that the Secretary now ascribes to Vogel. As discussed *infra,* however, Vogel maintains that he should have been credited with 28 quarters of coverage for the pre–1982 period, which includes four quarters not credited by the Secretary for the year 1956. This argument implies that without the additional 1956 quarters, Vogel had earned only 24 quarters of coverage during this period.

Although Vogel was initially notified that this second application was successful, the Secretary soon realized that this determination of eligibility assumed, contrary to his 1984 ruling, that Vogel had earned seven quarters of coverage from his affiliation with the Post Construction Company. Vogel consequently was informed by letter dated September 11, 1986, that the benefits had been incorrectly awarded and that he was to return the payments already received (A.R. 84). Alleging that his employment relationship with the 1517 Bonnie Brae Building Corporation entitled him to coverage, Vogel filed a request for reconsideration of this decision on September 16, 1986. This third appraisal of his case, however, ultimately yielded the same result as the second (A.R. 175–80), despite an interim "special determination" by a claims representative that Vogel's claim was meritorious (A.R. 172–73). Vogel's next strategy was to seek a *de novo* administrative hearing before an administrative law judge ("ALJ"), which was granted and held on January 21, 1988, but which failed to persuade the ALJ that Vogel qualified for benefits.

Predictably unhappy with this result, Vogel requested—and was granted—review of the ALJ's ruling by the Appeals Council of the Department of Health and Human Services. The Appeals Council notified Vogel on August 30, 1988, of its proposed conclusion, which was essentially the same as the ALJ's, and invited further argument and the submission of additional evidence (A.R. 189–90). Vogel's lawyer, responding to this request, submitted a letter in which he reemphasized Vogel's position that the 1517 Bonnie Brae Building Corporation earnings entitled him to old-age benefits. Through his lawyer, Vogel additionally asserted that the Secretary had under-credited him for the pre–1982 period by attributing to him but 25 of the 28 quarters of coverage that he had allegedly earned. Vogel's lawyer requested an explanation of how the Secretary had arrived at the "25" figure, but rather than submit any evidence to contest the Secretary's calculations, he merely advised the Appeals Council that Vogel had "provided [him] with copies of tax returns from 1951 through and including 1956 and one for 1958" and offered to "provide [the tax returns] upon request" (A.R. 193). With respect to Vogel's claim that he had earned seven quarters of coverage by virtue of his employment relationship with the 1517 Bonnie Brae Building Corporation, the Appeals Council used slightly different legal analysis but adopted the ALJ's findings of fact and ultimate conclusion that Vogel did not qualify for benefits. The Appeals Council similarly rejected Vogel's claim of 28 quarters of coverage prior to 1982, explaining that the Secretary's records lacked documentation of self-employment income for 1956 and 1957 and that unless the claimant provides evidence proving otherwise, these records are conclusive. The decision of the Appeals Council is the final decision of the Secretary and, pursuant to 42 U.S.C. § 405(g) (1982), Vogel filed an action in this court on January 30, 1989, seeking review of the Secretary's decision.

## DISCUSSION

Rather than make *de novo* findings of fact, this court must adhere to any factual determination that is supported by substantial evidence, *Davis v. Califano*, 603 F.2d 618, 624–25 (7th Cir.1979), 42 U.S.C. § 405(g), and uphold the decision if the record as a whole contains substantial evidence to support it, *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir.1984), provided there has been no error of law, which would warrant reversal "irrespective of the volume of evidence supporting the factual findings." *Schmoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir.1980). Evidence is "substantial" if " 'a reasonable mind might accept [it] as adequate to support [the] conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

### A. Income from the 1517 Bonnie Brae Building Corporation

Under the Social Security Act, 42 U.S.C. § 301 *et seq.* (1982 & Supp. V 1987), an

individual is eligible for old-age insurance benefits upon earning a specified amount in wages or self-employment income over a certain period of time. 42 U.S.C. §§ 413, 414. Excluded from self-employment earnings for the purpose of determining eligibility, however, is income from the rental of real estate and from personal property leased with the real estate, unless such income is "received in the course of a trade or business as a real estate dealer." 42 U.S.C. § 411(a)(1); *see also* 20 C.F.R. § 404.1082(a) (1989); *Delno v. Celebrezze,* 347 F.2d 159, 162 (9th Cir.1965). Regulations promulgated by the Social Security Administration provide further that rental income is *not* excluded to the extent that "services are also provided to the occupant" where such services are "primarily for the occupant's convenience and are other than those usually provided in connection with the rental of rooms or other space for occupancy only." 20 C.F.R. § 404.1082(d)(2) (1989). The rationale behind this exception for passive rental income is informed by the underlying purpose of old-age insurance; the system purports "to protect workers and their dependents from the risk of loss of income due to the insured's old age," and therefore an exclusion is made for "the receipt of income from the investment of capital," which old age would presumably not interrupt. *Delno,* 347 F.2d at 161; *Joyce v. Mathews,* 569 F.2d 1039, 1041 (8th Cir. 1978).

This regulatory scheme certainly excludes Vogel's rental earnings from the units at 1517 Bonnie Brae prior to its incorporation in 1984; Vogel argues, however, that the $300 monthly salary that he drew subsequently from the 1517 Bonnie Brae Building Corporation, a valid corporation under Illinois law, constituted wages rather than self-employment income and thus is not subject to the rental income exclusion. In denying Vogel's claim for benefits the Appeals Council rejected the argument that incorporation automatically transforms self-employment income into wages and instead inquired into whether the formation of the 1517 Bonnie Brae Building Corporation represented a change in substance as

well as form. Because the Council found there to be no change in Vogel's duties or services performed, it concluded that his affiliation with the corporation did not amount to "a valid employer-employee relationship" and that income "received from the corporation was not wages" (A.R. 8). Although couching the dispute as a factual battle, Vogel appears fundamentally to contest the legal standard that the Secretary used in reaching his conclusion, arguing that he was not justified in crossing the corporate moat that Vogel had built around his earnings from 1517 Bonnie Brae.

The framework for the Secretary's analysis and ultimate ruling was drawn from a 1978 social security ruling incorporating an Eighth Circuit case that presented nearly identical facts. *See* S.S.R. 78–28c (Cum.Ed. 1978); *Joyce v. Mathews,* 569 F.2d 1039 (8th Cir.1978). In *Joyce,* the claimants, a married couple, were sole officers, directors and shareholders of Priorview Properties, Inc., a corporation that purported to " 'buy, sell, lease, own, possess, mortgage, operate, and manage real and personal property....' " 569 F.2d at 1040. The claimants deeded two parcels of property, comprising seven apartments in all, to the corporation; both husband and wife received a quarterly wage of $50 allegedly as compensation for work in their capacities as officers and for services rendered to maintain the premises, such as cleaning common areas and vacant apartments, finding tenants, collecting rent, and handling tenant complaints. *Id.* at 1040–41. Corporate income, in the form of rent derived from the leased apartments, was kept in a checking account in the corporation's name that was used almost exclusively for corporate purposes, and annual shareholder meetings were held. The *Joyce* court, while acknowledging several legitimate business reasons for incorporation proffered by the claimants, such as facilitating the transfer of the corporation-owned properties to the claimants' children and limiting their personal liability, nevertheless rejected the claimants' argument that their income from Priorview Properties constituted wages. Whatever their motive for

incorporation, the court reasoned, the claimants after incorporation performed no more services "than those necessary 'to maintain the space in condition for occupancy.'" 569 F.2d at 1041 (quoting *Delno*, 347 F.2d at 163).

While social security rulings do not have the effect of law and are not binding on this court, they establish precedent that must be followed by the Secretary. *Lauer v. Bowen*, 818 F.2d 636, 639–40 & n. 9 (7th Cir.1987); *Social Security Law and Practice* § 1.18 (1987). Moreover, these rulings, which represent the Secretary's own interpretation of the regulations he promulgated pursuant to the Social Security Act and of this authorizing statute itself, "must be sustained [by this court] unless determined to be unreasonable." *Hubbard v. Califano*, 596 F.2d 623, 626 (4th Cir.1979); *cf. B.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir.1981) ("we accord [the agency's ruling] great respect and deference where the statute is not clear and the legislative history offers no guidance").

■ We find the reasoning and conclusion of *Joyce*—and therefore of the social security ruling—to be not only reasonable but also persuasive. It is well established that the Secretary has the prerogative and duty to examine the substance as well as the form of a relationship that affects a claim for benefits. This principle has been invoked in a variety of different contexts within the framework of old-age retirement benefits, such as wage shifting between spouses, *see Rebak v. Matthews*, 438 F.Supp. 668, 673 (S.D.N.Y.1977) (rejecting plaintiff's claim that he had retired and his wife had assumed control of corporation where plaintiff continued to perform same tasks and exercise same control; wage payments to wife discounted as part of disingenuous scheme of shifting income); *Bryan v. Mathews*, 427 F.Supp. 1263, 1267

(D.C.Cir.1977); *Gordon v. Finch*, 437 F.2d 253 (8th Cir.1971), classification of income, *see Weisenfeld v. Richardson*, 463 F.2d 670 (3d Cir.1972) (alleged salary found to be disguised dividends, which are not considered wages for old-age insurance purposes), and the formation of corporations. *See Flemming v. Lindgren*, 275 F.2d 596 (9th Cir.1960); *Moraites v. Celebrezze*, 1964 Unempl. Ins. Rep. (CCH) ¶ 16,299 (N.D.Ill.1964). It hardly seems unreasonable, therefore, that the *Joyce* court predicated its analysis on the "right and duty to scrutinize the actuality of the resulting relationships to determine if they are genuine and if the source of income is only a change of form rather than one of substance." 569 F.2d at 1041.

However consistently repeated this proposition may be, it appears that it has been applied—at least in the context of incorporation cases—with inconsistent rigor. One line of authority, cited but not developed by Vogel, suggests that the quest beyond the form to the substance of a corporation contemplates a simple inquiry into whether the corporation is bona fide in the sense that it has functioned as a legitimate business entity. *See Stark v. Flemming*, 283 F.2d 410 (9th Cir.1960); *Rebak*, 438 F.Supp. at 674–75; *Brannon v. Ribicoff*, 200 F.Supp. 697 (D.Mont.1961); *Williamson v. Celebrezze*, 1963 Unempl. Ins. Rep. (CCH) ¶ 15,014 (N.D.Ind.1963) (incorporated in S.S.R. 66–31c (Cum.Ed.1966)). According to these cases, the Secretary is not justified in denying the legitimacy of wages earned from a corporation where there has been proper adherence to corporate routines[3] and the salary is commensurate with the value of services rendered. *Rebak*, 438 F.Supp. at 675. This approach seems to be rooted in an objection to the lack of symmetry presented when a corporation must be respected in most contexts but may be dis-

---

**3.** The *Williamson* court listed several components of "the corporate routine":
    (1) Has there been a transfer of property (realty and personalty) to the corporation?
    (2) Were corporate directors and tax returns regularly filed?
    (4) [sic] Did the corporation maintain accounting records, books and journals?

    (5) Is there evidence that business was transacted with others and/or in behalf of the corporation?
    (6) Was business transacted in the corporate name?

regarded for social security purposes. *Cf. Brannon*, 200 F.Supp. at 702 ("The corporate entity ... may not be so summarily disregarded.... [T]he corporate arrangements would have to be respected by others and must be respected by the Secretary as well").

A competing line of cases, however, including two decisions of courts in this circuit, provides authority for the proposition that the Secretary can properly disregard a corporation even where it follows normal corporate routines. *See Dunn v. Ribicoff*, 1962 Unempl. Ins. Rep. (CCH) ¶ 14,545 (D. Mo.1962). Any legal regularity or legitimacy of which the corporation may be able to boast is considered irrelevant under this approach if the Secretary concludes that the corporation was formed to transform non-cognizable earnings into wages. *See Moraites v. Celebrezze*, 1964 Unempl. Ins. Rep. (CCH) ¶ 16,299 (N.D.Ill.1964) ("formation and dissolution of the corporation was merely a device to convert rental income to wages and, thus, ... the corporation was a sham and of no effect for social security purposes."); S.S.R. 63–36c (Cum.Ed.1963) (incorporating *Brunenkant v. Celebrezze*, 310 F.2d 355 (7th Cir.), *cert. denied*, 373 U.S. 921, 83 S.Ct. 1522, 10 L.Ed.2d 421 (1963)) (coverage denied where the "sole function of the corporation was its utilization by the plaintiff as a device to create a sham employment relationship for the sole purpose of attempting to convert his non-creditable earnings from futures trading into creditable wages"). The analysis in these cases reflects a willingness to sort through the various reasons offered by the claimants for incorporation in an attempt to determine whether the corporation in fact served primarily to create a specious employment relationship. Thus the court in *Moraites* discounted the claimant's assertion that the corporation was formed to facilitate the purchase of additional apartment buildings, finding that "serious consideration was never given to this purpose." Similarly, the *Dunn* court rejected the claimant's testimony that she formed the corporation in an attempt to ensure a more favorable probate of her estate upon her death.

■ Yet a third approach appears to have been espoused by the court in *Joyce*. While the court had little doubt that the corporation was formed to secure social security benefits, it also recognized that improper motive cannot disqualify an otherwise qualified claimant; the court rested its conclusion instead on a finding that the fundamental nature of the earnings had not changed. 569 F.2d at 1041. This approach strikes us as the most reasonable of the three.[4] The analysis used in the *Moraites* line of cases seems to rely too heavily on the Secretary's assessment of the true motive behind incorporation, in contravention of the widely recognized principle that motive alone will not defeat a claimant's bid for benefits. *See Gordon*, 437 F.2d at 257; *Stark*, 283 F.2d at 410; *Brannon*, 200 F.Supp. at 703; *Joyce*, 569 F.2d at 1041. And the *Rebak* technique of ascertaining merely that the corporation follows certain routines reflects a formalistic adherence to unnecessary symmetry that seems unduly to restrict the Secretary's ability to administer the Social Security Act in accordance with its purpose and goals. To allow a claimant to qualify for benefits on the basis of earnings that, but for a certificate from the Corporation Department of the Illinois Department of State and the filing of a few corporate tax returns would be excluded as rental income, would frustrate the goal of protecting "workers and their dependents from the risk of loss of income due to the insured's old age." *Delno*, 347 F.2d at 161.

---

**4.** The Secretary in the instant case does not try to persuade us that the reasoning in *Joyce* is superior to the *Rebak* line of authority but rather asserts that these older cases "are distinguishable on their facts from the instant case, and several of them were discussed and distinguished by the court in *Joyce*" (Defendant's Response at 11–12). But *Joyce* does not mention, to say nothing of distinguish, most of these cases, and some of them seem to this court closely to parallel the facts presented in the instant dispute. *See, e.g., Rebak*, 438 F.Supp. at 674 ("There is no provision made by the statute for excluding *bona fide* compensation or wages from the computation of earnings ... even if the wages are paid out of corporate income which was itself generated by real estate rentals").

That neither *Joyce* nor its encompassing social security ruling has been cited in subsequent federal court decision is not troubling. Vogel did not cite, nor were we able to find, *any* case decided after *Joyce* that dealt with analogous issues; indeed, it seems quite likely to this court that the very unambiguity of the *Joyce* ruling has deterred subsequent claimants from pursuing a similar dispute in federal court. It is likewise irrelevant that at least one of the older decisions that limited the Secretary's inquiry was incorporated in a social security ruling, *see* S.S.R. 66–31c (incorporating *Williamson v. Celebrezze*), for such a ruling is binding on the Secretary only until "expressly superseded, modified, or revoked by later legislation, regulations, court decisions or rulings." *Lauer*, 818 F.2d at 640 & n. 9.[5] S.S.R. 78–28c, the *Joyce* ruling, does precisely that. Vogel has failed to persuade us that the *Joyce* decision is not reasonable, and we therefore find no error in the Secretary's reliance on this case and its companion social security ruling in fashioning the legal standard in the instant dispute.[6]

■ The legal standard used by the Secretary thus validated, we now must review its application to the facts of this case. The relevant inquiry under the *Joyce* approach asks whether the services performed were "more than those necessary 'to maintain the space in condition for occupancy.'" Discussing the services performed by Vogel in connection with the 1517 Bonnie Brae Building Corporation, the Secretary observed:

> The record does not establish if or how the claimant's duties changed after he incorporated his building, nor does there appear to be any change in the business of 1517 Bonnie Brae Building itself. The claimant owned the building continuously since 1958.... He described his duties as setting, collecting and depositing rents, paying bills, bookkeeping, making minor repairs and contracting out large ones, and making management decisions. The claimant's duties appear to have remained the same both before and after incorporation, and are all duties real estate owners who manage their own rental properties customarily perform.

(A.R. 7). We recognize that the Social Security Act is intended to be interpreted liberally, *Conklin v. Celebrezze*, 319 F.2d 569, 571 (7th Cir.1963), and that, in keeping with this intention, the 20 C.F.R. § 404.1082(d)(2) provision that a claimant must render services for the benefit of his tenants in order to avoid application of the rental income exclusion should not be interpreted as to impose an unduly onerous burden on a would-be service provider. But Vogel merely asserts without substantiation or development that the services he provided were "primarily for the convenience of the occupant of the premises" (Plaintiff's Memorandum at 16). Even giv-

---

**5.** Vogel additionally urges that the *Joyce* standard is inconsistent with the approach compelled by the Social Security Administration's Program Operations Manual. We note initially that it is not apparent to this court that the guideline invoked by Vogel, POMS 02101.540, does not countenance the very approach adopted by the Secretary in this case; the guideline advises that

> SSA's interest is such that it cannot stop with the establishment of the corporate entity in fact or in law. Court precedent has well established SSA's right and duty to look beyond the form to substance in evaluating the operations of a corporation as they affect any aspect of a claim for benefits.

The POMS then directs the reader to seemingly conflicting authority: *Williamson v. Celebrezze*, which required only adherence to normal corporate routines, and *Brunenkant v. Celebrezze*, which rejected a valid corporation that served

only as a device to secure social security coverage. Whatever the proper interpretation of this guideline may be, however, it does not bind this court or the Social Security Administration. *Social Security Law and Practice* § 1.19 (1987).

**6.** Under the *Joyce* reasoning, alleged wages from corporations may not be credited for social security purposes regardless of whether they are earned in a capacity as employee or as officer of the corporation. Vogel's argument that corporate officers are automatically considered employees under 20 C.F.R. § 404.1006 (1989) is therefore unavailing to the extent that *Joyce* applies. Moreover, § 404.1006 provides that an officer is an employee only if "paid or ... entitled to be paid for holding office or performing services." Vogel did not receive any compensation as an officer of the 1517 Bonnie Brae Building Corporation (A.R. 31–32), nor does he claim that he was entitled to any payments.

ing Vogel every benefit that the liberal statute offers, we cannot agree that these services were provided for occupants as understood by § 404.1082(d)(2). Vogel does not point to a single example of a service rendered beyond those usually provided in connection with the rental of rooms or other space for occupancy only; activities such as collecting rent and making repairs do not even approach the level of service that the regulations seem to call for. *See* 20 C.F.R. § 404.1082(d)(2)(ii) (1989) ("We consider the supplying of maid service to be a service provided to the occupant. However, we do not consider the furnishing of heat and light, the cleaning of public entrances, exits, stairways, and lobbies, and the collection of trash, as services provided to the occupant."). Indeed, Vogel seems to have provided the bare minimum necessary to maintain the property in a suitable condition for occupancy, and therefore his earnings cannot escape the rental income exclusion under this theory either.[7]

Vogel makes one last effort to legitimate his earnings from 1517 Bonnie Brae by asserting that the corporation served not only as *lessor* of the Bonnie Brae apartments but also as a *dealer* in real estate in general. To support this claim Vogel quotes a passage from his Articles of Incorporation that indicates that one purpose of the 1517 Bonnie Brae Building Corporation is to "deal in and with real property." But that language is no more proof that the corporation is a dealer than the subsequent language in the articles—that the corporation purports "[t]o engage in any lawful act or activities for which corporations may be organized"—is proof that the corporation engages in all such activity; the articles of incorporation do not encompass the minimum that a corporation must do but rather the maximum that it can. Vogel has presented no additional proof that the corporation is "engaged in the business of selling real estate to customers for profit," 20 C.F.R. § 404.1082(b)(1), and therefore his dealer argument is not tenable.[8]

## B. *1956 Self-employment Income*

Independent of the dispute over his post–1982 income, Vogel argues that he is entitled to four quarters of coverage based on his self-employment income in 1956 and that the Secretary was arbitrary in ignoring his "tender" of tax return evidence supporting this claim. We find no evidence of arbitrary behavior in this case. The Social Security Act requires the Secretary to "establish and maintain records of ... the amounts of self-employment income" earned by individuals. 42 U.S.C.

7. Vogel cites one 1963 case that seems to adopt a very lenient standard for the "services to the tenant" question. In *Conklin v. Celebrezze,* 319 F.2d 569 (7th Cir.1963), an 84-year-old widow rented out two apartments and one single room in her house and sought social security benefits on the basis of the income derived from these rooms. For the single-room tenant, the claimant clearly provided sufficient services, but that income alone would not qualify her for benefits; the question before the court, then, was whether her activities with respect to the apartment tenants, which included receiving packages, placing them where they would be found, answering the door, taking and delivering telephone messages, stoking the furnace, and cleaning the common areas, were *sufficient to sustain her* application. Observing that "the moral purposes of this [social security] act do not contemplate that this eighty-four year old widow should render more services than she did," 319 F.2d at 371, the court awarded benefits.

It seems likely that the outcome in *Conklin* was influenced by the sympathies that the claimant's situation aroused, and the court there was additionally reluctant to bifurcate the classification of rent between the upstairs and downstairs rooms. *Cf. Moraites,* 1964 Unempl. Ins. Rep. ¶ 16,299 (rental exclusion applicable where claimant "furnished bed sheets, towels, and blankets ... cleaned and decorated vacant apartments and maintained the building in good order and safe condition" and "hired a full-time employee to clean hallways and bathrooms, answer the hall phone, and collect rents"). At any rate, the services that the widow provided in *Conklin* were more extensive than those rendered by Vogel in this case.

8. Because the decision of the Appeals Council, which is the final decision of the Secretary, is supported by substantial evidence, it is irrelevant that the convoluted administrative history of this case yielded some conflicting results. *See Bauzo v. Bowen,* 803 F.2d 917, 921 (7th Cir.1986) ("judicial review should be limited to determining whether the Appeals Council's decision is supported by substantial evidence on the record as a whole").

§ 405(c)(2)(A) (1982). These records may be corrected by the Secretary upon application by the concerned individual filed within three years, three months, and fifteen days after the disputed year; after this period, "the absence of an entry in the Secretary's records as to the self-employment income alleged to have been derived ... shall be conclusive." § 405(c)(4)(C); *see also Weisbraut v. Secretary of Dep't of Health and Human Services*, 757 F.2d 83, 85 (3d Cir.), *cert. denied*, 474 U.S. 852, 106 S.Ct. 152, 88 L.Ed.2d 125 (1985). The Secretary may correct his records after the time limitation, however, to conform his records to tax returns timely filed with the Commissioner of Internal Revenue. § 405(c)(5)(F)(i).

It is in light of this latter provision, we presume, that Vogel claims the Secretary acted arbitrarily. But Vogel never actually presented the Secretary with a copy of his 1956 returns, and § 405(c)(5)(F)(i) does not appear to require the Secretary to consider an undocumented assertion that an income tax return exists; rather, it is incumbent upon the individual seeking correction to supply such evidence. *See Burke v. Secretary of Health and Human Services*, 680 F.2d 1128, 1130 (6th Cir.1982) ("we refuse to deviate from the statute's clear rule that a claimant may document self-employment income only by submitting a timely filed income tax return."). *Jabbar v. Secretary of Health and Human Services*, 855 F.2d 295 (6th Cir.1988), on which Vogel relies, is inapposite. In that case the Secretary refused to correct his records without verification of the accuracy of the information contained on the claimant's timely filed tax return. Finding the Secretary to have imposed unduly stringent requirements on the claimant, the court held that the Social Security Act required the Secretary to correct his records to conform to tax returns filed within the time limitation unless such returns were filed fraudulently.

*Jabbar* is distinguishable from the instant case in two very significant ways. First, that case discussed and interpreted the requirements of § 405(c)(4)(C), which

provides a correction mechanism for errors discovered within the time limitation of three years, three months, and fifteen days; because this time limitation has clearly expired here, Vogel's claim is governed by § 405(c)(5)(F). And while the former provision states that the Secretary *shall* amend his records to include income erroneously excluded, the latter provides, less restrictively, that the Secretary *may* change his records to conform to new evidence of tax returns.[9] Secondly, the claimant in *Jabbar* actually supplied the Secretary with a copy of the tax return for the relevant year; it was in the Secretary's act of ignoring this submitted evidence that the court found error. The *Jabbar* analysis simply cannot be extended to a situation where a claimant merely asserts—over thirty years after the fact—that he filed a tax return for a disputed year.

### CONCLUSION

For the foregoing reasons, we find the Secretary's decision to be supported by substantial evidence. Defendant's motion for summary judgment is accordingly granted and plaintiff's is denied.

---

**9.** Indeed, the outcome in *Jabbar* rested in part on the court's interpretation of the "shall" language in § 405(c)(4)(C).